## L. B. CROSWHITE et ux *v.* Donald L. RYSTROM

73-247                                    506 S.W. 2d 830

Opinion delivered March 11, 1974
[Rehearing denied April 15, 1974.]

*Putman, Davis & Bassett,* for appellants.

*Sidney H. McCollum* and *Little & Lawrence,* for appellee.

LYLE BROWN, Justice. This suit was initiated by appellants L. B. Croswhite and wife against appellee Donald L. Rystrom. The Croswhites sought rescission of a sale and purchase contract between the parties and the deeds which were exchanged pursuant thereto. They alleged breach of warranty of title and resulting failure of consideration. Rystrom prayed for dismissal of the complaint and in case of rescission asked for monies he paid on a mortgage he assumed from the Croswhites. The chancellor found the issues against the Croswhites and dismissed their complaint. The Croswhites here contend (1) that the trial court erred in holding that the sale and purchase agreement did not merge with the warranty deed subsequently executed, (2) that there was a complete failure of title to the property conveyed to Croswhite and therefore a failure of consideration, and (3) that Rystrom would not be entitled, in the event of rescission, to a refund of monies paid on the mortgage he assumed.

Croswhite owned a one-half interest in the land and improvements operated under the name of Benton County Sales Barn, a livestock auction business. Subject to an undetermined cloud on his title, Rystrom owned a 5000 acre farm in Tennessee. Under a contract drafted by the parties and without the assistance of counsel, they bargained to exchange their properties. The contract, signed and notarized, reads:

February 1, 1967. We, L. B. and Jacqueline Croswhite agree to trade the equity in the Bentonville Livestock Auction. The balance as of Feb. 1, 1967 is $38,559.51. To Donald L. Rystrom and Evelyn for 5,000 acres of land in Tennessee. Description to Wit, possibly $10,-000.00 to be added to Sale Barn for Security of Bond to be put in Savings Account, to be transferred to Don Rystrom at time of signing Deeds. Also agreement between R. E. Allen and Don Rystrom that either Partner cannot sell his half interest before giving other Partner the opportunity to buy or his consent to sell to anyone.

Also Don Rystrom is to receive half share of money in Bentonville Livestock Custodial Account as well as the checks due not collected mentioned. The check on R. Bolin when suit is settled also goes with business.

The 5,000 acres of land in Tennessee is under observation. The deed is titled or made out to two parties. I understand that there is a possibility I might not get a clear Title which I am not holding Don Rystrom responsible. I also understand that if I have to sue Richard Cozad that I have the consent to sue through Don Rystrom. I will work the period of 90 days for Don Rystrom on Wednesdays and Saturday nights.

Deeds to Sale Barn to be signed over to Donald L. Rystrom and Evelyn as soon as suit is settled. [Reference to suit refers to local litigation by the sales auction.] Present Deed to Tennessee Land to be signed also. Possession of Sale Barn to be given as of Feb. 1, 1967 and all profits to be made payable to L. B. Croswhite and signed over to Don Rystrom. Tennessee State Land Grant Number 6173, Copy of deed being

found in Warranty Deed Book 17, page 30, Register's Office, Dunlap, Sequatchie County, Tenn. Note Book 2 page 71 Vol. 18 page 81. Special Warranty Deed from H.A.C. Development Corporation to Don L. Rystrom, recorded in the Register's Office of Warren County, Tennessee in Deed Book 145, page 436.

Under date of February 9, 1967, a standard form warranty deed was executed by Rystrom and delivered to the Croswhites. It was never recorded. The deed to the sales barn property was executed and delivered to Rystrom on April 13, 1967. Suit was filed May 18, 1967.

### Testimony for Appellants, the Croswhites

L. B. Croswhite testified that he owned a one-half interest in the Benton County Sales Barn, the other interest being owned by Sam Allen. They originally paid $100,000 for the property. At the time he delivered the deed for his interest to Rystrom, there was a balance of $38,000 owed on the property. Along with his interest in the auction sale, he conveyed his interest in the monies which were in two bank accounts. One was a custodial account to pay shippers for their livestock; the other was an expense account to pay for labor and merchandise.

Croswhite said Rystrom explained the condition of the title to the lands in Tennessee. Rystrom said he did not have an abstract but one would later be furnished by the corporation from whom Rystrom had purchased it. In the meantime Rystrom said "he would give me a deed for the land, that the land was there, I could use it, I could move on it, fence it, put cattle on it, or whatever I wanted to do with it". The witness said Rystrom assured him that the only problem was delivery of the abstract.

It was one week after the conversation just related that the parties executed the sale and purchase contract. "One day about noon we sat down in my house between Rogers and Bentonville and wrote it out with a pen on a piece of paper in longhand and that night my wife and I went over to Mr. Rystrom's house and used his typewriter and my wife

typed out the contract, as far as I know exactly as he and I had written it."

About a week later the Croswhites received from Rystrom a warranty deed to the Tennesses lands. It was April before a deed to the sales auction property was delivered to Rystrom. The witness explained that the delay was because Rystrom did not want his deed until "a lawsuit on the sales barn" was concluded.

About mid-April, Croswhite went to Tennessee to look at the land. He found a new metal building on the property with fuel barrels around it, apparently used as headquarters for the servicing of trucks. On past that building he saw "where they had been using it cutting off big timber, putting out seedling pines, reseeding it and going down through the property; I don't know what distance but there were people living on the left side, there were cattle pastured on it, new pasture that was up two or three inches, cattle was fenced in off the highway". The witness consulted an attorney in McMinnville, Tenn., and it was stipulated at the trial that if the attorney were present he would testify that he had examined the appropriate land records and concluded that the records did not reflect good and merchantable title in Rystrom. On his return to Benton County, Croswhite said he discussed the situation with Rystrom and the latter said "to give him time and he would get it all cleared away and he worked at it. He made several phone calls to try to get the abstract squared away. To this date, it has never been squared away; I have never received good title to the property."

With regard to the doubts expressed in the contract about the title to the Tennessee lands, Croswhite said on cross-examination that Rystrom "explained to me that this corporation was indebted to him to bring all the taxes and paperwork up to date and when he got them he would turn them over to me and he didn't want to be held responsible for back taxes and stuff like that and that's why we put it in there". The witness conceded he never instituted any action in Tennessee to clear the title.

Witness Kenneth Campbell testified he heard a brief

conversation between Croswhite and Rystrom wherein Rystrom said they would have to get an abstract and that in the meantime Croswhite could go ahead and fence the land and use it. He could not estimate the date of the conversation.

*Testimony for Appellee Rystrom*

Rystrom first introduced several written documents. One was a special warranty deed to the Tennessee lands from H.A.C. Development Corporation. The grantor agreed to "warrant and forever defend all and singular the rights vested in it to the said premises unto the said Grantee (Rystrom), against every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through and under it, but no further or otherwise". Another exhibit was a contract between the same parties executed shortly after the special warranty deed. H.A.C. agreed to pay all unpaid taxes and to do certain curative work on the title. The third exhibit was a commitment from a title insurance company in which it agreed to issue title insurance, subject to specified curative work. One of the requirements was to produce a certain deed in H.A.C. Development's chain of title. That deed was subsequently produced and recorded. We perceive the purpose of the recited exhibits was to show that a title company went so far as to issue a binder policy and that certain requirements for curative work were performed, all before the date of the contract between the parties to this litigation.

Rystrom testified that the reference in the contract of sale and purchase as to Rystrom's not having a clear title was inserted to confirm the understanding between the parties that there might be defects in Rystrom's title. The witness said Croswhite had never requested Rystrom to join in a suit to cure the title. It was not disputed that after the sales contract was signed Rystrom made several calls to Tennessee trying to help cure the title but he could not get in touch with one Cozad who seemed to be claiming some equity. Rystrom said that subsequent to those efforts he offered to cancel out the contract if Croswhite was not satisfied; however, he said Croswhite did not want to back out, that he wanted the lands in Tennessee.

On cross-examination Rystrom conceded that he had

previously listed the Tennessee property with a local real estate agent, Rex Bowlin; that the latter went to Tennessee and looked into the title; that Bowlin reported back to him "that the land had been owned by and the taxes paid on it for more than twenty years by the Hiwassee Lumber Company". Bowlin abandoned his listing. Rystrom said he told Croswhite about a claim by Hiwassee but that Croswhite still wanted to trade "as is".

When questioned as to why he signed a warranty deed to the Tennessee lands, Rystrom said he would not deny the signature but that he did not remember signing an instrument styled "Warranty Deed".

Rystrom took over possession of the one-half interest in the Sales Barn when he received his deed, which was April 13, 1967. Since that time, payments have been made out of the profits toward retirement of the bank mortgage. The business has concededly been profitable each year.

Rystrom said that after the deeds had been exchanged and just a few days before this suit was filed he offered to cancel the deal; he quoted Croswhite as saying he did not want the sales barn property, that he wanted the Tennessee land.

Witness Harley Clark said Croswhite had related to the witness that he had sold his interest in the sales barn in exchange for some farm property. He said Croswhite related that the title was cloudy but he thought it could be cleared.

Witness Sam Allen was the owner of the other one-half interest in the auction. He recited that some time before the sale and purchase was closed, appellee Rystrom made the statement in the presence of the witness and Croswhite that he had learned the title to his Tennessee property was worthless. Later, so the witness testified, Croswhite related that he had completed the trade and the witness inquired why he would trade his interest in the sales barn for land with a worthless title. To which question he said he received no reply. (On rebuttal, Croswhite denied both incidents.)

We have concluded that the case must be reversed. We

agree with appellant that the agreement respecting the sale of the Tennessee lands merged into the warranty deed subsequently issued. Also, it is apparent that Rystrom did not own good and merchantable title to those lands.

It is hornbook law that an agreement made for the sale of lands merges into a deed subsequently executed; however, if there be a showing of mutual mistake of fact, a misrepresentation, or perpetration of a fraud, the merger is not consummated. *Duncan* v. *McAdams,* 222 Ark. 143, 257 S.W. 2d 568 (1953). The presumption is that all prior negotiations merge into the instrument of conveyance. *Mills* v. *Deniston,* 227 Ark. 463, 299 S.W. 2d 195 (1957). It became the duty of Rystrom to overcome that presumption. *Duncan, supra.* Rystrom did not meet his burden.

In the case at bar there is no showing, in fact no contention, that there was a mutual mistake of fact; no misrepresentation by Croswhite is alleged to have been made in the procurement of the warranty deed; and certainly fraud on the part of Croswhite was not established. It is clear to us that there may have been a mistake of law, that is, the lack of an understanding of the legal effect of executing the deed.

Rystrom here contends (as he did in the court below) that in the event of rescission he should be refunded the monies he paid the Bank of Bentonville on a mortgage executed by the sales auction barn. His contention is grounded on the theory that in case of rescission the parties should be restored to status quo. 55 Am. Jur., Vendor and Purchaser, § 603. Because of the disposition of the case the trial court did not rule on the point. Furthermore, the evidence on the point was scant, being nothing but the bare statement of the amount paid on the mortgage from Rystrom's share of the profits of the business. Since the case is being reversed, we remand so that the trial court may rule on the question of restitution, and permit the parties, if they desire, to take further testimony thereon.

Reversed and remanded.