2009 Ark. App. 651

**DC XPRESS, LLC and Robert Sanders, Appellants,**

v.

**Mark BRIGGS, Appellee.**

**No. CA 08–1247.**

Court of Appeals of Arkansas.

Oct. 7, 2009.

Gary J. Barrett, Little Rock, for appellant.

Russell D. "Davy" Carter, III, Cabot, for appellee.

JOSEPHINE LINKER HART, Judge.

DC Xpress, LLC, and Robert Sanders (DC Xpress) appeal from an order of the Pulaski County Circuit Court finding them in default and granting judgment on a promissory note held by Mark Briggs. The order also rejected DC Xpress's counterclaim against Briggs for deceit and breach of fiduciary duty. On appeal, DC Xpress argues that the trial court erred by finding that Briggs proved his damages and awarding pre-and post-judgment interest; rejecting their counterclaims for deceit and breach of fiduciary duty; and allowing Briggs to use a deposition of Jill Sanders, who was not present at trial, to impeach Robert Sanders. We affirm.

For expediency, we will set forth those facts that are not in dispute and recount the trial testimony as it relates to each point when we take up DC Xpress's argument. In January 2003, Sanders and Briggs formed a trucking company, DC Xpress, LLC Briggs provided all of the capital to acquire assets of a failing trucking firm owned by Sanders's parents.

Sanders proposed to earn his fifty-percent interest in the company through "sweat equity."

Briggs, a computer programmer who had worked for twenty-one years as Quality Foods' data-processing manager, knew nothing about the trucking business. Nonetheless, he was named in the DC Xpress operating agreement as the "operating manager," which was defined as the chief executive officer of the company. Concomitantly, Briggs accepted employment as a data-processing consultant for Quality Foods. He performed most, if not all, of his consulting on the business premises of DC Xpress.

The relationship between Sanders and Briggs quickly soured. Sanders decided to buy out Briggs's interest in DC Xpress, and entered into a prolonged process that ultimately produced a business separation agreement. On December 14, 2004, Briggs, individually, and Sanders, both individually and as "managing member" of DC Xpress, signed the agreement. The writing, which contained an integration clause, specified that Briggs would relinquish his fifty-percent interest in the company in exchange for the return of his capital[1] and a further $85,000 payment. The agreement also stated that Sanders and DC Xpress would release Briggs from "any and all obligations of the company." Sanders and DC Xpress promised to give Briggs a $75,000 lump-sum payment upon execution of the agreement, and the balance of $134,770.39 was secured by a $30,000 "Quick Pay Note," which required six monthly payments of $5000, and a

$109,770.39 "Term Note," which payed six-percent interest and required thirty-eight $3104.97 monthly payments to amortize the balance.

Sanders and DC Xpress paid the lump-sum payment and the Quick Pay Note as specified in the agreement. They also made monthly payments on the Term Note for a year. However, payments ceased, and on November 3, 2006, Briggs sued DC Xpress for $82,440.70 plus interest. DC Xpress filed a general denial and counterclaimed, asserting deceit, breach of fiduciary duty, and conversion.[2] Regarding the breach of fiduciary duty claims, it was DC Xpress's theory that those causes of action arose from Briggs pursuing his consulting business on the DC Xpress premises, his failure to become more actively involved in the management of the trucking company, and allegations that Briggs told the company bookkeeper, Jill Sanders, not to forward payroll taxes to the IRS when the company had a cash-flow problem. The deceit claim was apparently based on allegations that Briggs overstated the value of the company in the buy-out negotiations.

The trial court found in favor of Briggs and granted judgment in the amount of $72,510.75, plus six-percent prejudgment interest from the date of the last payment and postjudgment interest of ten percent. The trial court apparently arrived at that number by noting that under the terms of the Term Note, DC Xpress was obligated to pay $109,770.39 in thirty-eight monthly payments of $3089.64. DC Xpress was granted judgment in its "coun-

1.  The writing recited that Briggs provided the initial capital to DC Xpress, $172,977.86. Of that sum, $129,770.39 was currently owed to Briggs after deductions for various monies received.

2.  The conversion claim involved a $10,095 certificate of deposit containing DC Xpress funds that was retained by Briggs and a deed to a vacant lot in Hot Springs Village that had an approximate value of $4000. DC Xpress prevailed on these claims, and they are not an issue in this appeal.

terclaims"[3] for a CD containing business funds that Briggs had wrongfully retained and real estate that was titled in the name of Briggs and Sanders that Briggs had transferred "without authority."

DC Xpress first argues that the trial court erred by finding that Briggs proved his damages and established his entitlement to pre-and postjudgment interest. It points to Briggs's testimony that he could not figure out the interest that had accrued on the Note without an amortization schedule. Further, DC Xpress cites the trial court's finding that "neither party presented adequate evidence as to the amount of interest that accrued on the Term Note" and asserts that the trial court erred when it awarded interest "on its own accord." We believe that this argument mischaracterizes the trial court's ruling as well as the evidence presented in the case.

In bench trials, the standard of review on appeal is whether the trial court's findings were clearly erroneous or clearly against the preponderance of the evidence. *Smith v. Eisen,* 97 Ark. App. 130, 245 S.W.3d 160 (2006). We give due deference to the superior position of the trial court to determine the credibility of the witnesses and the weight to be accorded their testimony. *Id.* Further, it is within the province of the trier of fact to resolve conflicting testimony. *Id.*

At the trial, Briggs introduced the separation agreement and the Term Note. He testified that he had received only twelve of the thirty-eight payments due on the Term Note, approximately \$36,000. Briggs stated that, based on a document prepared by his attorney, as of trial, he was owed \$92,344.72. He further asserted that he was owed interest on the unpaid balance on the Term Note. On cross-examination, Briggs was presented with a pocket calculator by DC Xpress's attorney and asked to calculate the interest owed to him, but expressed his inability to make such a calculation.

Contrary to DC Xpress's assertions, the amount owed under the Term Note was readily ascertainable from the proof presented at trial. Sanders did not controvert Briggs's testimony that he received only twelve of the thirty-eight \$3089.64 monthly payments required by the express terms of the Term Note. This evidence yielded an easily deducible balance when DC Xpress stopped making payments. The Term Note also recited that the unpaid balance would be subject to six-percent interest. Finally, postjudgment interest is required by statute. Ark.Code Ann. § 16–65–114(a) (Repl.1999).

DC Xpress next argues that the trial court erred by not finding in its favor in its counterclaim for deceit and breach of fiduciary duty. We first note that while DC Xpress mentions "deceit" in the heading of this point, it is not developed in its argument. We therefore conclude that it is only concerned with the breach-of-fiduciary-duty claim. Regarding the breach-of-fiduciary-duty claim, DC Xpress concedes that pursuant to Arkansas Code Annotated section 4–32–304 (Repl.2001),[4] for

---

**3.** Although the trial court did not specifically mention the breach of fiduciary duty and deceit counts, the order nonetheless purports to dispose of the claims.

**4.** Except for the personal liability for acts or omissions of those providing professional service as set forth in § 4–32–308, a person who is a member, manager, agent, or employee of a limited liability company is not liable for a debt, obligation, or liability of the limited liability company, whether arising in contract, tort, or otherwise or for the acts or omissions of any other member, manager, agent, or employee of the limited liability company. Ark.Code Ann. § 4–32–304.

Briggs to be liable for breach of fiduciary duty as a manager of a limited liability company it would have to prove that Briggs engaged in gross negligence or willful conduct, but asserts that that standard was met. It asserts that Briggs breached his fiduciary duty because he "did not actively try to educate himself in ways of the trucking industry," which was part of his duties as the operating manager. It also asserts that Briggs's simultaneous operation of a computer-consulting business, which he termed "detrimental" to DC Xpress, and his reluctance to "get involved in the operations" was further evidence of Briggs's breach of fiduciary duty. Finally, DC Xpress argues that this breach of fiduciary duty resulted in damages from "unnecessary tax liability" and penalties from the IRS and the Arkansas Workers' Compensation Commission. We find no error on this point.

▮ Breach of fiduciary duty involves betrayal of a trust and benefit by the dominant party at the expense of one under his influence. *Cole v. Laws*, 349 Ark. 177, 185, 76 S.W.3d 878, 883 (2002) (citing 36A C.J.S., *Fiduciary* 388–89 (1961)). A person standing in a fiduciary relationship may be held liable for any conduct that breaches a duty imposed by the fiduciary relationship. *Id.* Moreover, regardless of the express terms of an agreement, a fiduciary may be held liable for conduct that does not meet the requisite standards of fair dealing, good faith, honesty, and loyalty. *Id.* The guiding principle of the fiduciary relationship is that self-dealing, absent the consent of the other party to the relationship, is strictly proscribed. *Id.*

We attribute the trial court's failure to find in favor of DC Xpress to a failure of proof. We summarize its case as follows. Robert Sanders and Michael Vogelpohl testified that Briggs worked at his consulting business during business hours. DC Xpress's expert, Donald Dane Davis, stated that Briggs did not perform many of the duties associated with similarly situated managers in the trucking industry. Robert Sanders also testified that Briggs directed his wife, Jill Sanders, not to forward payroll taxes to the Internal Revenue Service and to underreport payroll hours to the company's workers' compensation carrier. Briggs denied these allegations, and Sanders's testimony on this issue was impeached at trial.

▮ Contrary to DC Xpress's apparent theory of the case, the mere fact that a chief operating officer pursues other business ventures does not constitute a breach of the duty of loyalty. While Briggs may have been occupied performing tasks that did not advance the interest of DC Xpress, it is abundantly clear that Briggs's consulting business did not compete with DC Xpress in the trucking business or in any way injure DC Xpress. Moreover, Briggs testified that his duties consisted of securing capital for DC Xpress, not directing day-to-day operations. It was uncontroverted that Sanders and company president Allen Crump were supposed to be taking care of that aspect of the company's management.

▮ Further, we cannot say that the evidence supports the allegation by DC Xpress that the damages it sought were proximately caused by Briggs's conduct. It should be noted that absent specific findings, we presume that the trial court acted properly and made the findings necessary to support its judgment. *Tillery v. Evans*, 67 Ark. App. 43, 991 S.W.2d 644 (1999); *Jocon, Inc. v. Hoover*, 61 Ark. App. 10, 964 S.W.2d 213 (1998). As noted previously, Robert Sanders asserted that Briggs told Jill Sanders not to pay the payroll taxes and underreport payroll to

their workers' compensation carrier, and Briggs denied doing so. Sanders was impeached on this issue both by Jill Sanders's deposition and by a letter authored by Robert Sanders to Virgil Young, dated July 20, 2004, stating that the company had "changed locks and passwords to prevent any further intrusion by Mr. Briggs on our property." It was not disputed that the failure to forward payroll taxes to the IRS occurred in the last quarter of 2004, when according to the Sanders letter, Briggs was excluded from the premises. Accordingly, we hold that the trial court's decision not to find for DC Xpress on its breach-of-fiduciary-duty claim was not clearly erroneous.

■ For its final point, DC Xpress argues that the trial court erred in allowing Briggs to impeach him with Jill Sanders's deposition when none of the five conditions set forth in Rule 32(a)(3) of the Arkansas Rules of Civil Procedure were shown to exist.[5] It asserts that *Crisp v. Brown*, 4 Ark. App. 208, 628 S.W.2d 596 (1982), requires that we reverse and remand this case on this point. We disagree. A trial court is accorded wide discretion in evidentiary rulings, and will not be reversed on such rulings absent a manifest abuse of discretion. *Arthur v. Zearley*, 337 Ark. 125, 992 S.W.2d 67 (1999). It is, of course, axiomatic that it is incumbent upon the appellant to establish by specific argument that the trial court erred.

We note that in arguing for the use of Jill Sanders's deposition to impeach Robert Sanders, Briggs directed the trial court to subsection (a)(1) of Rule 32, not subsection (a)(3). Indeed, at trial, Briggs conceded that use of the deposition would not be permissible if he was proceeding under subsection (a)(3). It is apparent that the trial judge agreed with Briggs when she allowed him to use the deposition. This fact is of pivotal importance.

■ Section (a) of Rule 32 states in pertinent part:

At the trial ... any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with *any* of the following provisions....

(Emphasis added.) The plain wording of section (a) puts subsection (a)(1) on an equal footing with subsection (a)(3). The former is not limited by the availability of the witness, but rather only by the admissibility of the deposition under the Arkansas Rules of Evidence. Because each subsection presents a different criterion for use of a deposition, to prevail on appeal, DC Xpress had to focus its argument on the section that was actually used by the trial judge in her ruling. Clearly, DC Xpress makes no argument concerning

---

**5.** In pertinent part, the subsection states: The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: (A) that the witness is dead; or (B) that the witness is at a greater distance than 100 miles from the place of trial or hearing, or is out of this state, unless it appears that the absence of a witness was procured by the party offering the deposition; or (C) that the witness is unable to attend or testify because of age, illness, infir- mity, or imprisonment; or (D) the party offering the deposition has been unable to procure the attendance of the witness by subpoena; or (E) upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used. Ark. R. Civ. P. 32(a)(3).

subsection (a)(1). Accordingly, this failure is fatal to its argument on appeal. In closing, we note that DC Xpress's reliance on *Crisp* does not compel a different result. In *Crisp,* the court of appeals held that a deposition was improperly admitted into evidence because it contained inadmissible hearsay, which of course is not admissible under the Arkansas Rules of Evidence, and, more importantly, clearly not the issue before us.

Affirmed.

VAUGHT, C.J., and GRUBER, J., agree.