2010 Ark. App. 802

**Wenzel WOCHOS and Debra Proto Wochos, Appellants**

v.

**B.J. WOOLVERTON and Carolyn Woolverton, et al., Appellees.**

No. CA 10–249.

Court of Appeals of Arkansas.

Dec. 1, 2010.

Wenzel Wochos, pro se.

Debra Proto Wochos, pro se.

Ernest Eudox Patterson, Hot Springs, Michael Lee Wright, Michael E. Hale, Barber, McCaskill, Jones & Hale, P.A., Little Rock, for appellee.

COURTNEY HUDSON HENRY, Judge.

Appellants Wenzel Wochos and his wife, Debra Proto Wochos (Proto–Wochos), alleged in this action that they were fraudulently induced to purchase a lakeside condominium in Hot Springs from a real estate broker and his wife, appellees B.J. Woolverton and Carolyn Woolverton, and that the title company and escrow agent, appellee Garland County Title Company (GCTC), and its employees, appellees Stephen DeMott and Carol Sikorski, had knowledge of the fraud and failed to inform appellants of it. The Garland County Circuit Court granted summary judgment to all appellees. For reversal, appellants contend that the circuit court erred in granting summary judgment because numerous issues of fact remain in dispute. We affirm the summary judgment in favor of GCTC and its employees and reverse and remand as to the Woolvertons.

B.J. Woolverton is the owner of Hot Springs Realty, and he and his wife, Carolyn Woolverton, worked as agents for the company. Jamie Ashley, who is also an agent for Hot Springs Realty, showed the condo in question to appellants. Appellees Stephen DeMott and Carol Sikorski are the owners of GCTC. Sikorski handled the closings on appellants' purchase of the condo from the Woolvertons on December 23, 2005, and the Woolvertons' purchase of the same condo from Delbert and Betty Rogers on December 15, 2005. B.J. Woolverton was the listing agent for the Rogerses' condo when he agreed to sell it (as the owner of the condo) to appellants. According to the evidence submitted by appellants, B.J. Woolverton led them and Ashley to believe that he and his wife personally owned the condo and that it was currently occupied by "renters" who had been there for a year, paying $1,250 per month. However, the Rogerses, who actually owned the condo and agreed to sell it to the Woolvertons, did not know that B.J. Woolverton had misrepresented his ownership of the condo to appellants or that he had entered into an agreement to immediately sell it to appellants for $10,000 more than he had paid them for it.

The relevant timeline was as follows. On December 2, 2005, the Woolvertons

secured an exclusive right to sell the condo for the Rogerses for the listing price of $137,000. On December 3, 2005, the Woolvertons signed a contract to purchase the condo from the Rogerses for $120,000. On December 6, 2005, the condo was placed on the Hot Springs Realty property tour. That same day, B.J. Woolverton showed the condo to Ashley and appellants, allegedly making misrepresentations about his ownership, the condo's being occupied by renters, and the storage space and boat slip that were to convey with the condo. On December 6, 2005, Proto–Wochos signed an offer dated December 7, 2005, to buy the condo from the Woolvertons for $130,000. This document stated that the sellers were to provide her with the by-laws of the property owners' association within three days of acceptance. On December 8, 2005, the Woolvertons opened an escrow with GCTC to buy the condo from the Rogerses, submitting an earnest-money deposit of $500. On December 12, 2005, the Woolvertons opened a second escrow with GCTC to sell the condo to Proto–Wochos, submitting appellants' earnest-money deposit of $20,000. GCTC issued a title commitment signed by DeMott effective December 13, 2005. On December 15, 2005, the Woolvertons closed on their purchase of the condo from the Rogerses. On December 23, 2005, Proto–Wochos closed on her purchase of the condo from the Woolvertons. She received a warranty deed that also conveyed "storage space" and bills of sale to the boat slip and the condo's furnishings.

After appellants became aware of the Woolvertons' actions, Proto–Wochos filed a complaint with the Arkansas Real Estate Commission against the Woolvertons. The commission found that the Woolvertons had violated Commission Regulation 8.5(a), stating:

> Respondents Woolverton as Dual Agents did not protect and promote the interest of Complainant. Respondents Woolverton did not advise Complainant that they did not own the unit at the time Respondents entered into the December 7, 2005 Real Estate Contract with Complainant and that the transaction with Complainant was conditioned on Respondents Woolverton closing their transaction with Seller, who Respondents had a real estate contract with to purchase the unit.

The commission ordered the Woolvertons to attend classes related to agency representation and disclosure. The commission also found that Ashley had not protected the interests of her clients, even though Proto–Wochos did not file a complaint against her. Appellants also filed a complaint against GCTC with the Arkansas Insurance Department. According to appellants, that department did not find any violations.

Appellants sued the Woolvertons on July 28, 2006, alleging that they had been fraudulently induced to make the offer on the condo. They amended their complaint on May 24, 2007, to add Carol Sikorski as a defendant. Appellants amended their complaint a second time on May 16, 2008, adding Stephen DeMott and GCTC as defendants and asserting negligence and breach of fiduciary duty against them.

Appellants allegedly encountered problems with the property owners' association when they attempted to lease the condo. On June 29, 2007, appellants sold the condo to Joyce Burris and Garland Edwards for $155,000; they received $145,447.13 in cash at closing.

Sikorski, DeMott, and GCTC moved for summary judgment, arguing that they did not commit fraud or breach any duty they may have owed appellants and that appellants had failed to prove any damages. In support of their motion, they attached ex-

cerpts from the depositions of Proto–Wochos, Wochos, and DeMott; the Woolverton–Proto–Wochos settlement statement; six deeds in appellants' chain of title; and the deed from appellants to Burris and Edwards. GCTC, DeMott, and Sikorski also argued that appellants had entered into a contract to purchase the condo from the Woolvertons prior to any involvement of GCTC and that they, therefore, did not induce appellants to enter into the contract. They stated that Proto–Wochos admitted in her deposition that she had no contact with anyone at GCTC before making her offer and that she was not aware of any role GCTC played in her negotiations with the Woolvertons; that the sale of the property from the Rogerses to the Woolvertons closed on December 15, 2005, prior to the sale to appellants on December 23, 2005; and that appellants made no claim against their title insurance. Further, GCTC, DeMott, and Sikorski argued that they had not breached their fiduciary duty to appellants, which was to examine the public records as to the insured title and to offer title insurance, and that appellants had received good title. Appellees maintained that appellants sought to impose on GCTC a duty to investigate matters well beyond the scope of a title company or escrow agent's realm of responsibility. Appellees pointed out that the length of time the Woolvertons had owned the condo was not a term of the real-estate contract and was wholly irrelevant to GCTC's role in the transaction. They further argued that appellants had failed to establish damages because appellants had sold the property for $25,000 more than they had paid for it. They also pointed out that Wochos had admitted in his deposition that the boat slip had increased the value of the condo and that he had placed a $25,000 value on it when appellants sold it in 2007.

Appellants responded to GCTC's motion by filing a copy of B.J. Woolverton's statement to the Arkansas Real Estate Commission, in which he said:

I have owned several condos in Hot Springs, which I have rented to tenants, and I currently had one rented for $1200 a month and one for $1250 a month. I have not had any problems renting my condos to the "race crowd" for five months of the year and the "lake crowd" for five months of the year. I do receive numerous calls concerning rental property and I did tell the [Wochoses] that I would pass on their name and phone number to prospective tenants.

At no time did I state that I had owned this particular condo for a year or that it was currently rented for $1200 a month.

Appellants also filed a copy of DeMott's "Narrative of Events" for the Arkansas Insurance Department:

On December 5, 2005, we received an order for title work from Hot Springs Realty Company for the purchase of Unit A, Sunset Cove HPR. The Purchasers were B.J. Woolverton and Carolyn Woolverton. The Purchase Price was one hundred twenty thousand Dollars ($120,000.00). This transaction closed on December 15, 2005, and the deed was filed of record on December 15, 2005, in Book 2634 at Page 860 of the Deed and Mortgage Records of Garland County, Arkansas.

On December 12, 2005, we received an order for title work from Hot Springs Realty Company for the purchase of the same unit. The Purchaser of the unit was identified as Ms. Debra Wochos, a/k/a Debra D. Proto. We received the earnest money check that day (12/12/05) and the order was logged into our system on December 13, 2005 at 8:43 a.m.

The Complainants allege that we provided them a Commitment of Title In-

surance on either December 13 or 14, 2005, however, our Title Commitment was not produced until December 16, 2005, as reflected by the invoice. Our software automatically dates the invoice, which is produced and printed at the same time as the commitment. I am also attaching a copy of our internal courthouse worksheet reflecting that the courthouse records were checked in December 14, 2005. The worksheet identifies that the title searcher was waiting on the Warranty Deed to the Woolvertons to be recorded prior to typing the commitment. Consequently, the claim of Wochos and Proto that they received our Commitment on either December 13 or 14, 2005 reflecting title in the Woolvertons cannot be true, as the Commitment was not typed and produced until Friday, December 16, 2005.

We admit that the effective date of the Commitment reflects December 13, 2005 at 8 a.m. It is our practice to backdate the effective date of the commitment at least one day prior to the date the effective date the file is searched at the courthouse to prevent or avoid any "gap" issues which might be occasioned by a delay in recording or posting by courthouse personnel. In this instance, we regret that the commitment was dated December 13, 2005, rather than December 15, 2005. Nevertheless, if in fact the complainants received their Commitment prior to closing (which there is no indication that they did, and we have no knowledge of them requesting or receiving said commitment prior to close), it would have been subsequent to the recordation of the Woolverton deed and thus correctly reflecting the Woolvertons as record titleholders.

Attached you will find a copy of the Tax Report provided in connection with each transaction. You will note that the Report reflects the previous owners as title holders. If in fact we were conspiring to deceive the purchasers, it would make no sense to have disclosed the Rogers (prior owners) as title holders.

In further response to the motion for summary judgment, appellants submitted the affidavit of Jamie Ashley. Summarizing, Ashley stated that appellants engaged her to locate rental investment property and that they desired to purchase a condo with a boat dock. She said that, when B.J. Woolverton showed them the condo in question, he represented that he and his wife owned the condo and that they leased it for $1,200 per month, renting it to racetrack trainers for five and one-half months and to persons who enjoyed the lake for five and one-half months. Ashley said that B.J. Woolverton also stated the renters would be vacating the premises in two weeks, that he received several calls a week for rentals, and that he would be pleased to give callers appellants' name and phone number to help them rent the condo. She said that appellants requested the by-laws of the property owners' association and that Caroline Woolverton gave her a "stack of paperwork" that Caroline represented as being a complete set of the by-laws.

Appellants also presented Wenzel Wochos's affidavit dated December, 1 2009. He stated in his affidavit that he and his wife were prepared to make an offer of $95,000 on another condo that had no boat or storage locker. Wochos averred that they did not make a profit on the sale of the condo after paying closing costs and expending thousands of dollars in repairing and upgrading the condo.

The Woolvertons also moved for summary judgment. They argued that any representations made during negotiations of the parties prior to closing had merged into the deed; that parol evidence was

inadmissible to vary or contradict the deed's terms; and that appellants had failed to establish damages. They attached copies of the offer and acceptance between Proto–Wochos and the Woolvertons, the deeds from the Rogerses to the Woolvertons, from the Woolvertons to Proto–Wochos, and from appellants to their purchasers; the bill of sale to the boat slip from the Woolvertons to Proto–Wochos; the title insurance policy; the settlement statement; a protective order and motion showing alleged discovery abuses perpetrated by appellants; excerpts from appellants' depositions; and an affidavit by Nancy Horner, the long-time manager of Sunset Cove. Horner stated:

2.  I was the manager in December, 2005, when B.J. and Carolyn Woolverton sold Unit A of Phase One to Debra Proto.

3.  Contrary to what Ms. Proto and her husband, Wenzel Wochos, alleged they were never denied the opportunity to rent the unit. Tenants are common at Sunset Cove. I was a tenant there myself. Ms. Proto and Mr. Wochos had a tenant renting their unit during the brief spell that they owned it.

4.  Contrary to what Ms. Proto and Mr. Wochos have alleged, they did buy a boat slip from Mr. and Mrs. Woolverton, which they sold with the unit in June of 2007. They also purchased an undivided interest in all of the common property at the HPR, including the applicable storage space.

5.  I was present at the project on a regular basis during the time Ms. Proto and Mr. Wochos owned it. It was in very good condition when they bought it and I am not aware of any significant improvements that they made prior to selling the unit.

6.  Ms. Proto and Mr. Wochos were extremely troublesome owners and in fact, in an effort to intimidate me, Ms. Proto once stated "We sue people, that's what we do."

Appellants responded to the Woolvertons' motion for summary judgment by pointing out that the Woolvertons had made a profit of $10,000 in one week after securing the Rogerses' exclusive right to sell their condo and failing to abide by their promise to the Rogerses to forward all offers to them. Appellants argued that the doctrine of merger did not apply in this situation because of the Woolvertons' fraudulent misrepresentations. Appellants asserted that, although their offer was made contingent upon receiving the by-laws, they were never given an operating policy for the property owners' association, which restricted their ability to rent the unit. Appellants further stated that the contract used by GCTC did not contain Carolyn Woolverton's signature as seller, but only as the listing agent; nevertheless, the contract attached by the Woolvertons to their motion contained her signature as seller. Appellants further argued that the subject of damages was a question of material fact, alleging that they did not make a profit on the sale of the condo after making repairs and paying property owner's association dues, taxes, insurance, and utilities. Among the many documents filed by appellants was the settlement statement for their sale of the condo, which reflected that they had received a net sum of $145,447.13 at closing.

In addition, appellants filed a second affidavit by Wenzel Wochos dated December 10, 2009. He stated that B.J. Woolverton told him that the personal belongings and the boat in the dock belonged to the renters. Wochos said that B.J. Woolverton also advised him that the boat slip was worth $25,000 to $30,000 and that it would rent for $200 to $300 a month. He stated that Sikorski told him that the

Woolvertons had clear title and that they were "rock solid." Wochos asserted that they would not have purchased the condo had they known that the Woolvertons were in the process of buying it for $10,000 less than their offer. He stated that they were willing to purchase the condo for $130,000 based on the "one-percent rule" of being able to recover one percent of the purchase price in monthly rent. He also detailed the labor and the sums he and his wife expended to repair and update the condo. Wochos also spoke of the trouble they encountered renting the condo and the difficulties they experienced with the property owners' association. He stated that the agency they hired to rent the condo for them quit because of the association's rental policies and requirements. Wochos said that they rented the condo for five weeks at the price of $1,000 per month.

Appellants also submitted Proto–Wochos's affidavit. In it, she stated that B.J. Woolverton told them that he had owned the condo for one year, that he currently rented it for $1,200 a month, but that they could probably lease it for as much as $1,300 per month. Proto–Wochos also claimed that B.J. Woolverton commented that the condo came with a ⌐₁₁storage unit and that the boat in the slip was owned by the renters. She said that Sikorski informed her that, because of the commitment for title, it was not necessary to check the deeds in the chain of title. Proto–Wochos further stated that Nancy Horner advised them that they had to follow the regulations contained in the condominium association's operating policy in renting the condo. She said that they had never before seen the operating policy and that it contained more restrictions than those of the by-laws. Proto–Wochos stated that they purchased the condo as a long-term, income-producing asset and that they sold it to mitigate damages due

to the losses they incurred by owning the condo.

On December 23, 2009, the circuit court granted summary judgment to the Woolvertons. The same day, it granted summary judgment to GCTC, Sikorski, and DeMott. Appellants filed a timely notice of appeal.

Summary judgment may be granted by a trial court only when it is clear that there are no genuine issues of material fact to be litigated and the party is entitled to judgment as a matter of law. *Bisbee v. Decatur State Bank*, 2010 Ark. App. 459, 376 S.W.3d 505. The moving party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Lee v. Martindale*, 103 Ark.App. 36, 286 S.W.3d 169 (2008). When the movant makes a prima facie showing of entitlement, the respondent must meet proof with proof by showing genuine issues as to a material fact. *Dodson v. Allstate Ins. Co.*, 365 Ark. 458, 231 S.W.3d 711 (2006). ⌐₁₂When there are genuine questions of material fact with regard to a party's intent, summary judgment is improper. *Id.* On appeal, we need only decide if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion left a material question of fact unanswered. *Bisbee, supra.* In making this decision, we view the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.*

In their points on appeal, appellants argue that they raised genuine issues of material fact on their fraudulent-induce-

ment claims, especially concerning the issue of damages. They also assert that the trial court should have considered Horner's credibility, giving numerous reasons why she was biased against them. Appellants further point to numerous documents prepared by the Woolvertons and GCTC as evidence that the entire transaction was fraudulent. Appellants also argue that appellees misled the circuit court by making certain inaccurate factual statements. We address these points together because they are all relevant as to the propriety of summary judgment on the fraud claims. Of course, credibility is not relevant because, as expressed above, we view the evidence in the light most favorable to appellants.

■ The elements of fraud are (1) a false representation of a material fact, (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation, (3) intent to induce action or inaction in reliance upon the representation, (4) justifiable reliance on the representation, and (5) damage suffered as a result of the reliance. *Gorman v. Gilliam*, 2010 Ark. App. 118, 374 S.W.3d 117. Constructive fraud has been defined as a breach of a legal or equitable duty, which, irrespective of the moral guilt of the fraud feasor, the law declares to be fraudulent because of its tendency to deceive others. *Beatty v. Haggard*, 87 Ark.App. 75, 184 S.W.3d 479 (2004). Generally, however, liability for a nondisclosure may be found only in special circumstances, where there is a duty to communicate the purportedly concealed material fact. *See Downum v. Downum*, 101 Ark.App. 243, 274 S.W.3d 349 (2008). Failure to speak is the equivalent of fraudulent concealment only in circumstances when a duty to speak arises, such as those involving a confidential relationship, and where one party knows another is relying on misinformation to his detriment. *Gorman, supra.* The question is one of fact when the evidence as to fraud or breach of fiduciary duty is in conflict. *Acuff v. Bumgarner*, 2009 Ark. App. 854, 371 S.W.3d 709.

■ There is no dispute that GCTC and its agents played no part in Proto–Wochos's decision to purchase the property. There is also no evidence that they had any knowledge of B.J. Woolverton's alleged representations to appellants when he showed the property. The documents prepared by GCTC also reveal no evidence of fraud. Additionally, there is no evidence that GCTC had knowledge that appellants did not receive the property owner's association's operating policy. DeMott's unrebutted explanation in his deposition for backdating the title commitment prepared December 16, 2005, to avoid "the gap" between the title search and closing, adequately addressed any inference of misrepresentation by GCTC as to the Woolvertons' ownership of the property before their closing. When the Woolvertons actually conveyed the property to appellants, they owned it. Fraud cannot be inferred from the fact that various copies of the Woolverton–Proto–Wochos contract lacked Carolyn Woolverton's signature. Additionally, the bills of sale to the furnishings and the boat slip signify nothing. To the extent that the warranty deed to Proto–Wochos referred to the storage space, that is only relevant to the representations made by B.J. Woolverton when he showed the condo to appellants. We therefore hold that appellants failed to establish fraud by GCTC or its agents.

■ Appellants did, however, adequately establish a fact issue regarding damages to resist a motion for summary judgment by the Woolvertons. Even though appellants sold the condo for $25,000 more than they paid for it, they sufficiently "met

proof with proof" on the issue of damages. As they explained in their affidavits, appellants spent money on repairs, the property owner's assessment dues, and other expenses that they would not have incurred if they had not purchased the property in reliance on B.J. Woolverton's alleged representations. With these considerations in mind, we reverse and remand as to the Woolvertons. Genuine issues of material fact remain on appellants' claim of fraudulent inducement as to them.

We also agree with appellants' argument that the doctrine of merger did not apply to this case. It is hornbook law that an agreement, as well as all prior negotiations, made for the sale of land merges into a deed subsequently executed; however, if there is a showing of misrepresentation of fact or fraud, the merger is not consummated. *Croswhite v. Rystrom,* 256 Ark. 156, 506 S.W.2d 830 (1974). A merger clause in a contract, which extinguishes all prior and contemporaneous negotiations, understandings, and verbal agreements, is simply an affirmation of the parol evidence rule. *Farmers Coop. Ass'n v. Garrison,* 248 Ark. 948, 454 S.W.2d 644 (1970). Parol evidence, however, is admissible to show fraudulent inducement to contract. *Sellers v. West–Ark Constr. Co.,* 283 Ark. 341, 676 S.W.2d 726 (1984). A merger clause will not prevent a party from showing that he or she was fraudulently induced to enter the contract. 92 C.J.S. *Vendor and Purchaser* § 49 (2000). Therefore, the circuit court erred in granting summary judgment to the Woolvertons on this basis.

Appellants, however, did not produce sufficient evidence to survive the motion for summary judgment on their claims against GCTC and its agents for breach of fiduciary duty and negligence. An escrow agent is the agent of both the buyer and the seller and is charged with the duty of carrying out the terms and conditions of the escrow agreement. *Collins v. Heitman,* 225 Ark. 666, 284 S.W.2d 628 (1955). As such, it is in a relation of confidence, which it cannot violate to its own advantage or to the detriment of either principal. *Id.* The escrow agent is a fiduciary and is required to exercise reasonable skill and ordinary diligence in carrying out his or her responsibilities and must conduct the affairs with which he or she is entrusted with scrupulous honesty, skill, and diligence. 28 Am.Jur.2d *Escrow* § 26 (2000). Breach of fiduciary duty involves betrayal of a trust and benefit by the dominant party at the expense of one under his influence. *DC Xpress, L.L.C. v. Briggs,* 2009 Ark. App. 651, 343 S.W.3d 603. A person standing in a fiduciary relationship may be held liable for any conduct that breaches a duty imposed by the fiduciary relationship. *Id.* Moreover, regardless of the express terms of an agreement, a fiduciary may be held liable for conduct that does not meet the requisite standards of fair dealing, good faith, honesty, and loyalty. *Id.* The guiding principle of the fiduciary relationship is that self-dealing, absent the consent of the other party to the relationship, is strictly proscribed. *Id.*

Appellants' assertions of negligence also involved the issue of what duty the title company owed them. In order to prove negligence, there must be a failure to exercise proper care in the performance of a legal duty that the defendant owed the plaintiff under the circumstances surrounding them. *Marlar v. Daniel,* 368 Ark. 505, 247 S.W.3d 473 (2007). The law of negligence requires as essential elements that the plaintiff show that a duty was owed and that the duty was breached. *Id.* The question of what duty, if any, is always a question of law and never one for the jury. *Id.* Duty is a concept that arises

out of the recognition that relations between individuals may impose upon one a legal obligation for the other. *Id.* If no duty of care is owed, summary judgment is appropriate. *Id.*

Appellants argue that GCTC and its agents had information that the transaction was fraudulent and that they violated their fiduciary duty to inform appellants before they went through with closing. We disagree. As discussed above, there was no evidence that they had knowledge of B.J. Woolverton's representations to appellants. Obviously, they did know that the Woolvertons were "flipping" the property; however, the real estate contract did not provide that a "flip" would breach the agreement. We can find no case law to support appellants' argument that GCTC had any legal duty to inform them that the Woolvertons were doing so. The escrow agent's duty to disclose information is addressed in 28 Am.Jur.2d *Escrow* § 27 (2000):

> As a fiduciary, the depositary is charged with the duty to disclose to a party to the escrow any information he or she receives whose disclosure is necessary to prevent a loss to the party, but he or she has no duty to go beyond the escrow instructions and notify any party to the escrow of any suspicious fact or circumstance that may come to his or her attention. However, in some jurisdictions, the agent has no duty to disclose information he or she receives unless such a duty is required by the terms of the escrow agreement; and such a duty will not be implied.

Because appellants produced no proof that GCTC and its agents breached any duty they owed appellants, we affirm the circuit court's award of summary judgment to them.

Affirmed in part; reversed and remanded in part.

ABRAMSON and BROWN, JJ., agree.